John G. KEEGAN, et al., Plaintiffs,

v.

STEAMFITTERS LOCAL UNION
NO. 420 PENSION FUND, et
al., Defendants.

No. 00–CV–4246.

United States District Court,
E.D. Pennsylvania.

July 23, 2002.

Doris J. Dabrowski, Philadelphia, PA, for plaintiffs.

Kent Cprek, Sagot Jennings and Sigmond, Philadelphia, PA, for defendants.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

In this action John Keegan ("Keegan"), Harry Instase ("Instase"), and Philip Garton ("Garton") (collectively "plaintiffs") have brought suit against Steamfitters Local Union No. 420 Pension Fund ("420 Pension Fund" or "Local 420 Fund"), William T. Sweeney ("Sweeney"), the former administrator of that fund, and United Association Local Union No. 322 Pension Fund ("322 Pension Fund" or "Local 322 Fund"). Plaintiffs instituted this action pursuant to 29 U.S.C. § 1132, the Employee Retirement Income Security Act ("ERISA") and claim that the defendants violated the law by breaching their fiduciary responsibilities owed under the act.

This action began when a complaint was filed on August 21, 2000. Plaintiffs allege that the defendant organizations and individuals breached their duties by failing to secure payments due under reciprocal agreements between two of the local unions, 322 and 420. They are seeking relief in the form of monetary contributions owed to the Local 420 Pension Fund and a declaratory judgment finding that the defendants breached their fiduciary duty and articulating their rights under the Pension Plan and under ERISA. On November 23, 2001, I denied the plaintiffs' motion for partial summary judgment and granted in part defendants' motion for summary judgment, dismissing a number of defendants. However, I denied the defendants' motion for summary judgment as to the Local 420 Pension Fund, the Local 322 Pension Fund, and William Sweeney.

On July 1, 2002, I conducted a bench trial to determine the meaning of the reciprocal agreements between the Local 322 Pension Fund and the Local 420 Pension Fund and to determine whether Sweeney had breached his fiduciary responsibilities under ERISA.

### FINDINGS OF FACT [1]

#### Parties

1. Plaintiff John Keegan was born on April 3, 1950 and is a resident of New Jersey. He became a member of Leadburners Local Union No 532 ("Local 532") on October 31, 1974, and a member of Steamfitters Local Union No. 420 on February 1, 1984.

2. Philip C. Garton was born on June 27, 1943. He became a member of Local 532 on August 11, 1979, and a member of Steamfitters Local Union No. 420 on February 1, 1984.

3. Plaintiff Harry F. Instase was born on June 19, 1942. He became a member of Local 532 on November 11, 1978, and a member of Steamfitters Local Union No. 420 on February 1, 1984.

4. Defendant Steamfitters Local Union No. 420 Pension Fund is a trust and a multiemployer defined benefit pension plan.

5. Defendant William T. Sweeney is the former administrator of the Local 420 Fund. Gerald L. Diviny is the current administrator of the Local 420 Fund.

6. Steamfitters Local Union No. 420 ("Local 420") is a local union and labor organization.

7. The United Association ("UA") Local Union No. 322 Pension Plan is a trust and multiemployer defined benefit pension plan.

8. Plumbers and Pipefitters Local Union No. 322 ("Local 322") is a local union and labor organization.

#### Work History

*Local 532*

9. Local 532, as well as Local 420, Local 121 and Local 322, all are (or were) separate local unions affiliated with the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (the "UA International").

10. The Local 420 Fund, Local 322 Fund and prior Plumbers & Steamfitters Local Union No. 121 Pension Fund ("Local 121 Fund") all are "Taft–Hartley" or multiemployer pension plans established un-

---

1. Findings of fact 1–17, 19, 21–22, 24–27, 29–31, 33, 36, 38–44, 53, and 59 reflect the stipulations of the plaintiffs and defendants. Findings of fact 18, 20, 23, 28, 32, 34–35, 37, 45–52, 54–58, and 60–65 are my own determinations and are based upon the exhibits and testimony at trial.

der 29 U.S.C. § 186(c) as separate trusts, apart from the local unions, and are governed by a joint board of an equal number of union and management representatives.

11. Local 532 had no pension plan nor contribution reciprocal agreements to provide its members with pension benefits. Its members thus received pension benefits only through work sufficient to vest and receive benefits under the pension plan established by another local union and employers, pursuant to the collective bargaining agreement of another local union or a plan of a single employer.

*Local 121 Fund*

12. At various times before December 1978, Keegan and Instase worked in the jurisdiction of Local 121 of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("UA Local 121"). These collective bargaining agreements required pension contributions to the Local 121 Fund for any work performed under the contract.

13. Keegan's work history with Local 121 and 322 between his first work in late 1973 until the year before a merger of the Local 121 Fund with the Local 322 Fund (effective August 1, 1979) was as follows:

| Work Period Start | Work Period End | Hours | Rate | Contributions |
|---|---|---|---|---|
| 09/11/73 | 12/31/73 | 613.20 | $0.38 | $ 233.02 |
| 01/01/74 | 07/28/74 | 752.70 | $0.40 | $ 301.08 |
| 10/31/74 | 12/31/74 | 0 | $0.00 | $ 0.00 |
| 01/01/75 | 12/31/75 | 0 | $0.00 | $ 0.00 |
| 01/01/76 | 12/31/76 | 0 | $0.00 | $ 0.00 |
| 01/01/77 | 05/31/77 | 0 | $0.00 | $ 0.00 |
| 06/01/77 | 12/31/77 | 1,263.20 | $0.47 | $ 593.70 |
| 01/01/78 | 12/31/78 | 2,311.90 | $0.52 | $ 1,202.19 |
| 01/01/79 | 07/31/79 | 1,855.00 | $0.52 | $ 964.60 |
| | TOTAL: | 6,796.00 | | $ 3,294.59 |

14. Instase's work history with Local 121 between his first work in late 1973 until the year before a merger of the Local 121 Fund with the Local 322 Fund (effective August 1979, or later) was as follows:

| Work Period Start | Work Period End | Hours | Rate | Contributions |
|---|---|---|---|---|
| 10/1/77 | 12/31/77 | 450.20 | $0.47 | $ 211.59 |
| 01/01/78 | 03/31/78 | 510.50 | $0.47 | $ 239.93 |
| 04/01/78 | 05/31/78 | 311.50 | $0.47 | $ 146.40 |
| 06/01/78 | 09/30/78 | 0 | $0.47 | $ 0.00 |
| 10/01/78 | 12/31/78 | 674.50 | $0.47 | $ 317.01 |
| 01/01/79 | 07/31/79 | 0 | $0.47 | $ 0.00 |
| | TOTAL: | 1,946.70 | | $ 914.93 |

15. Garton had no work history with Local 121 (or Local 322) before August 1, 1979.

16. UA Local 121 merged with UA Local 322 in July of 1977. The Local 121 Fund and Local 322 Fund only merged later. The merger document is limited to a February 12, 1980 resolution of the Local 322 Fund Trustees. The surviving fund is known as the UA Local 322 Pension Fund.

17. Local 121 was separate from Local 322 during the period from October 1, 1974 to July 1977. The Local 121 Fund had no contribution reciprocal agreements with any other funds before 1977. As a result, no money was forwarded to Local 532 nor the Local 322 or Local 420 Plans for work for any of the plaintiffs during this time.

18. Joseph Wilkins was an officer of Local 121 in the early 1970s as well as a member who was working on the site at the Salem Nuclear Power Plant, also known as Artificial Island which is the predominant work site in issue. Local 121, located in the Atlantic City, New Jersey area, had primarily seasonal work—in the off season for tourists in the fall and winter. As a result, Local 121 was a "sending" local whose members often worked outside of the jurisdiction of their local

union during the summer and other months. The Local 121 Plan had no reciprocal agreements with any other Plans before 1977. As a result, no money was forwarded to Local 532 nor the Local 322 or Local 420 Plans for work for any of the plaintiffs during this time.

19. After the merger of Locals 121 and 322, in July, 1977, the Local 121 Pension Fund signed contribution reciprocals with other local union pension funds. In particular, a contribution reciprocal agreement between the Local 121 Pension Fund and Local 420 Pension Fund was signed on December 20, 1977.

20. The Local 121 Funds treated workers from other areas as participants in the Local 121 benefit plans when they qualified for benefits under those plans. The practice of the Local 121 Funds was to issue a booklet describing all benefit plans to employees when they first achieved eligibility for health and welfare benefits after one year of work. Plaintiffs Keegan and Instase acknowledged that they were aware of health and welfare benefits and in fact were recipients of benefit payments under the Local 121 health and welfare plans during their work in New Jersey.

21. Keegan, Garton, and Instase also acknowledged that they were aware of a 10–year vesting requirement for benefits under the Local 121 Fund and Local 322 Fund. They never performed the required work to vest under these pension plans.

*Local 322 Fund*

22. The Local 322 Fund and the Local 420 Fund signed a contribution reciprocal agreement on December 12, 1973. Plaintiffs had no work or membership connection to the Local 420 Fund or the Local 322 Fund at the time of this agreement.

23. As stated in the recital of the reciprocal agreement between the Local 420 Plan and the 322 Plan, the Trustees of both plans believed the agreement to be in the best interests of the employees. Recognizing that such employees may not always be in their home jurisdiction, the Trustees expressed their desire to "keep the employees of each Pension Trust Fund eligible for benefits if possible."

24. After December 1978 and through February 1, 1984 or beyond, plaintiffs worked in the jurisdiction of Local 322. These collective bargaining agreements required pension contributions to the Local 322 Fund for any work performed under the contracts.

25. Keegan's work history with Local 322 and the Local 322 Fund after the August 1, 1979 effective date of the merger with the Local 121 Fund was as follows:

| Work Period Start | Work Period End | Fund Hours | Rate | Contributions |
|---|---|---|---|---|
| 08/01/79 | 12/31/79 | 598.00 | $0.52 | $ 310.96 |
| 01/01/80 | 12/31/80 | 1,543.00 | $1.00 | $1,543.00 |
| 01/01/81 | 04/29/81 | 655.00 | $1.45 | $949.75 |
| 05/01/81 | 12/31/81 | 1,437.25 | $1.75 | $2,515.19 |
| 01/01/82 | 12/31/82 | 2,122.00 | $1.75 | $3,713.50 |
| 01/01/83 | 12/31/83 | 2,275.00 | $1.75 | $3,981.25 |
| 01/01/84 | 02/01/84 | 144.00 | $1.75 | $252.00 |
| 02/01/84 | 08/01/84 | 1,335.50 | $1.75 | $2,337.13 |
| | TOTAL: | 10,109.75 | | $15,602.78 |

The contributions for work after January 31, 1984 were reciprocated to the Local 420 Fund. The remaining hours total 8,774.25 with contributions of $13,265.65 for this work.

26. Garton's work history with Local 322 and the Local 322 Fund after the August 1, 1979 effective date of the merger with the Local 121 Fund was as follows:

| Work Period Start | Work Period End | Hours | Rate | Contributions |
|---|---|---|---|---|
| 10/01/79 | 12/31/79 | 414.00 | $0.52 | $ 215.28 |
| 01/01/80 | 12/31/80 | 1,792.00 | $1.00 | $ 1,792.00 |

| | | | | |
|---|---|---|---|---|
| 01/01/81 | 04/29/81 | 150.00 | $1.45 | $ 217.50 |
| 05/01/81 | 12/31/81 | 1,218.75 | $1.75 | $ 2,132.81 |
| 01/01/82 | 12/31/82 | 2,384.00 | $1.75 | $ 4,172.00 |
| 01/01/83 | 12/31/83 | 1,051.00 | $1.75 | $ 1,839.25 |
| 01/01/84 | 01/31/84 | 0.00 | $1.75 | $ 0.00 |
| 02/01/84 | 07/31/84 | 1,003.00 | $1.75 | $ 1,755.25 |
| 08/01/84 | 12/31/84 | 1,022.00 | $1.85 | $ 1,890.70 |
| 01/01/85 | 04/30/85 | 630.00 | $1.85 | $ 1,165.50 |
| 05/01/85 | 12/31/85 | 1,256.00 | $2.20 | $ 2,763.20 |
| 01/01/86 | 02/28/86 | 322.50 | $2.20 | $ 709.50 |
| | TOTAL: | 11,243.25 | | $18,652.99 |

The contributions for work after January 31, 1984 were reciprocated to the Local 420 Fund. The remaining hours total 7,099.75 with contributions of $10,368.84 for this work.

27. Instase's work history with Local 322 and the Local 322 Fund after the August 1, 1979 effective date of the merger with the Local 121 Fund was as follows:

| Work Period Start | Work Period End | Hours | Rate | Contributions |
|---|---|---|---|---|
| 03/01/81 | 12/31/81 | 63.00 | $1.45 | $ 91.35 |
| 01/01/82 | 12/31/82 | 616.00 | $1.45 | $ 893.20 |
| 01/01/83 | 12/31/83 | 0.00 | $1.75 | $ 0.00 |
| 01/01/84 | 01/31/84 | 0.00 | $1.75 | $ 0.00 |
| 02/01/84 | 07/31/84 | 0.00 | $1.75 | $ 0.00 |
| 08/01/84 | 12/31/84 | 244.00 | $1.85 | $ 451.40 |
| 01/01/85 | 04/30/85 | 592.00 | $1.85 | $ 1,095.20 |
| 05/01/85 | 05/31/85 | 141.50 | $2.20 | $ 311.30 |
| | TOTAL: | 1,656.50 | | $ 2,842.45 |

The contributions for work after January 31, 1984 were reciprocated to the Local 420 Fund. The remaining hours total 679.00 with contributions of $984.55 for this work.

28. Garton continued to work in the jurisdiction of Local 322 through at least February 1986, indicating that plaintiffs had the opportunity to continue working in the jurisdiction of Local 322 and were not forced out of such work or the Local 322 Plan by the later transfer of their union membership to Local 420.

29. None of the plaintiffs completed ten (10) years of service required to vest under the Local 322 Fund and have not worked under the Local 322 Fund since 1984.

*Local 420 Fund*

30. Effective February 1, 1984, Plaintiffs became members of Steamfitters Local Union No. 420 ("Local 420"). They subsequently received standard UA International membership cards, showing their Local 420 affiliation and their original dates of initiation into the UA International through Local 532. Keegan also received a form letter from Local 420 in 1999 congratulating him on 25 years of service of Local 420 and the UA International.

31. The transfer occurred as a result of a series of orders of the UA International which first consolidated various local unions into a new Local Union 153, based in New Jersey, and then transferred certain members, who worked in areas not covered by the new local, to other local unions, including Local 420. Plaintiffs and others often refer to this transaction as a "merger" of Local 532 and Local 420. One stated purpose of the transfer was to allow these employees to receive pension benefits. Plaintiffs did not have the option of joining Local 322 at the time of this merger, and were assigned to Local 420.

32. Keegan, Garton, and Instase were present at a meeting of Local 532 members at their introduction to Local 420 in January 1984. At that meeting a union representative from Washington D.C. told those present that pre–1984 contributions would not be reciprocated. As Garton recalls, a representative of the UA International told them, "Don't even try to get

[Local 121/322 contributions]. You are young. You will make it up in 420."

33. On May 31, 1984, Thomas Killeen, then the Local 420 Plan administrator, notified the Local 322 Plan of the former Local 532 "Leadburner" members who were transferred to Local 420. Plaintiffs have been given credit and money has been sent to the Local 420 Fund for all work under the Local 322 Fund on or after February 1, 1984.

34. On April 2, 1984, Keegan inquired about his pension credits with the Local 322 Fund. On April 11, 1984, William A. Ford, the Local 322 Plan Administrator at the time, advised Keegan that he had 7 years, 10 months of pension credit under the Local 322 Fund. On April 24, 1984, Keegan made a second request to inquire if Local 121 Fund service was included in the April 11, 1984 letter. On April 26, 1984, Ford responded that the credited service included time with the Local 121 Fund.

35. Keegan never worked in the jurisdiction of Local 322 after August 1984.

36. Keegan, as well as Garton and Instase, subsequently received annual work history statements from the Local 420 Fund. For Garton and Instase, they never showed credit for work under the Local 121 Fund or Local 322 Fund before February 1, 1984. The same is true for Keegan, except for a 1996 statement that was corrected in 1997.

37. The 1984 version of the Steamfitters Local Union No. 420 Pension Fund ("Local 420 Fund") required 800 hours of work in a calendar year to become a participant.

38. Keegan worked 415 hours under the Local 420 Fund in 1979 and 312.50 hours in the Local 420 area again in 1980. He then left and did not return until late 1984. As a result of the break, the 1979 and 1980 hours and related benefits were lost and forfeited according to the Local 420 Fund.

39. Keegan became a participant in the Local 420 Fund. Keegan's credited hours with the Local 420 Fund from February 1, 1984 to December 31, 2001 (including reciprocated Local 322 Fund hours from February 1, 1984 forward) are as follows:

| Year | Hours |
| --- | --- |
| 1984 | 2,158.37 |
| 1985 | 2,239.00 |
| 1986 | 2,093.25 |
| 1987 | 2,318.50 |
| 1988 | 2,980.62 |
| 1989 | 2,547.00 |
| 1990 | 2,698.25 |
| 1991 | 3,008.50 |
| 1992 | 2,639.76 |
| 1993 | 2,873.38 |
| 1994 | 2,899.00 |
| 1995 | 2,715.50 |
| 1996 | 2,587.00 |
| 1997 | 2,008.00 |
| 1998 | 2,898.88 |
| 1999 | 2,637.51 |
| 2000 | 2,880.25 |
| 2001 | 2,472.34 |
| **TOTALS:** | **$46,655.11** |

Keegan's accrued monthly pension under the Local 420 Fund was $1,865.19 at December 31, 2001.

40. Garton became a participant in the Local 420 Fund. Garton's credited hours with the Local 420 Fund from February 1, 1984 to December 31, 2001 (including reciprocated Local 322 Fund hours from February 1, 1984 forward) are as follows:

| Year | Hours |
| --- | --- |
| 1983 | 70.00 |
| 1984 | 2,219.00 |
| 1985 | 2,410.00 |
| 1986 | 2,013.30 |
| 1987 | 1,815.50 |
| 1988 | 1,419.95 |
| 1989 | 1,359.75 |
| 1990 | 1,143.75 |
| 1991 | 1,353.50 |
| 1992 | 1,096.25 |
| 1993 | 1,716.25 |

| | |
|---|---|
| 1994 | 1,923.75 |
| 1995 | 824.00 |
| 1996 | 1,673.25 |
| 1997 | 1,555.51 |
| 1998 | 1,826.14 |
| 1999 | 300.00 |
| 2000 | 0.00 |
| 2001 | 0.00 |
| TOTALS: | 24,719.90 |

41. Garton retired from the Local 420 Fund, effective March 1, 1999 with an accrued monthly pension benefit of $986.00.

42. The Local 420 Plan did not credit Mr. Garton for any Local 322 Fund service prior to February 1, 1984 to determine his accrued benefit.

43. Instase became a participant in the Local 420 Fund. Instase's credited hours with the Local 420 Fund from February 1, 1984 to December 31, 2000 (including reciprocated Local 322 Fund hours from February 1, 1984 forward) are as follows:

| Year | Hours | Monthly Benefit |
|---|---|---|
| 1981 | 1,651.00 | 66.04 |
| 1982 | 1,239.00 | 49.56 |
| 1983 | 0.00 | 0.00 |
| 1984 | 1,273.37 | 50.93 |
| 1985 | 1,702.00 | 68.08 |
| 1986 | 1,837.25 | 73.49 |
| 1987 | 2,500.25 | 100.01 |
| 1988 | 2,210.62 | 88.42 |
| 1989 | 2,248.50 | 89.94 |
| 1990 | 2,617.25 | 104.69 |
| 1991 | 2,254.00 | 90.16 |
| 1992 | 2,200.38 | 88.02 |
| 1993 | 1,142.25 | 45.69 |
| 1994 | 2,262.51 | 90.50 |
| 1995 | 2,132.00 | 85.28 |
| 1996 | 2,125.50 | 85.02 |
| 1997 | 2,482.76 | 99.31 |
| 1998 | 1,351.88 | 54.08 |
| 1999 | 2,053.64 | 82.15 |
| 2000 | 2,238.64 | 89.55 |
| TOTALS: | 34,632.80 | $ 1,500.92 |

Instase's accrued monthly pension under the Local 420 Plan was $1,500.92 as of December 31, 2001.

44. Plaintiffs are vested in Local 420 Fund benefits for all work on or after February 1, 1984.

*Contribution Reciprocal Agreements*

45. Under the Local 420 Plan practice, a written contribution reciprocal agreement was also executed between pension plans before work was performed. Once the basic agreement was written, it was supplemented by individual notices to reciprocate. An employee who was leaving the jurisdiction of Local 420 to work in another area would complete a traveling card, indicating the area in which he would be working. The card included a request to transfer fringe benefit contributions paid for his work back to the Local 420 Plan. When contribution reciprocal payments were received by the Local 420 Plan, they would be entered into the Local 420 Plan system and would then show up on the quarterly work history reports and the annual pension statements sent to each participant.

46. Absent a complaint by the participant over an absence of hours, the Local 420 Fund would accept a report of reciprocal hours from the other fund as accurate. At all times relevant to this lawsuit, the Local 420 Plan has provides its participants with a quarterly and annual work history report. Since at least 1991, the annual statement included a full list of hours credited under the Local 420 Plan in each year during the employees' career. The statement was mailed to participants to allow them to check both their current work history (reflecting both Local 420 work and any reciprocal receipts) and to report any errors to the Local 420 Plan office.

47. The Local 420 relied on member complaints concerning reciprocal payments, in particular, as it had no other means of identifying the amount of hours

worked in an area for which it received no direct employer reporting of hours.

48. Mr. Wilkins, and defendants' actuarial expert, James J. McKeogh testified that all contribution reciprocal agreements that they have observed have been "before the fact,"—meaning before work was performed. Mr. Sweeney is now the administrator of the Plumbers and Pipefitters National Pension Fund and administers some 325 contribution reciprocal agreements in that capacity. Even in that broad range, he has never seen a contribution reciprocal agreement applied on the "after the fact" basis that plaintiffs seek to apply in this case to transfer contributions years after work is performed.

49. The uncontradicted testimony of Sweeney, Wilkins, and McKeogh concerning universal practice indicates that there is no evidence of any custom or intention to "reciprocate" Local 322 Fund contributions to the Local 420 Fund on a retroactive basis for plaintiffs' work while they were members of Local 532, before they became members of Local 420 and participants in the Local 420 Fund.

*Transfer Request*

50. On December 3, 1995, Keegan wrote to William Ford ("Ford"), the Local 322 Plan's administrator, to ask why his Local 322 Plan credited service was not forwarded to the Local 420 Fund. On October 3, 1996, Kurt Krueger, the Local 322 Business Manager, wrote to Ford to inquire if Keegan's pension credits could be transferred.

51. At some point around the same time, Keegan approached Sweeney and showed him the 1984 letter from the Local 322 Fund concerning his pension credits with that fund. Sweeney told Keegan that he would be happy to help him contact the Local 322 Plan with his questions.

52. Keegan wrote to Sweeney about his pension credits on October 23, 1996. In response to Keegan's inquiries, Sweeney, the Local 420 Fund Administrator, wrote to Ford on November 26, 1996, and asked whether Keegan's pension credits could be transferred. On November 27, 1996, Sweeney sent a second letter to Ford with a detailed account of Keegan's work history and union affiliation in UA Locals 56, 532 and 420 as provided to him by Keegan. Sweeney's letter noted that there was no contribution reciprocal agreement relating to Local 532 and inquired about a transfer of "pension benefit credit."

53. On January 21, 1997, Ford sent Sweeney a check for $16,063.44 along with a detail of Keegan's hours and contributions. This check simply equaled the contributions (without interest) for hours worked by Keegan less an administrative fee. Sweeney notified Keegan of the check in a January 27, 1997 letter.

54. The check sent by Ford does not reflect the cost of any pension benefits or credit due Keegan under the Local 121 Fund or Local 322 Fund. Mr. McKeogh, the actuary for the Local 322 Plan, testified that the value of Keegan's "pension benefit credit" is something different than contributions for hours worked. If, as represented by the Local 322 Fund, Keegan was not vested in the Local 322 Fund and had suffered a permanent break in service so as to cancel all prior credits, the value of his "pension benefit credit" was zero. If his Local 322 pension benefit credit simply continued to exist under the Local 322 Plan, the value of his benefit under the Local 322 Plan (using the pension formula and rates in effect at the time of his last work in New Jersey in 1984) was approximately $20,000. If the desire was simply to add an additional 7 years and 10 months to his service and benefits under the current pension benefit formula

of the Local 420 Fund, the cost of this pension credit would be approximately $92,000.

55. The retroactive reciprocal check for Keegan was unusual and there was no authorization in the minutes of the Local 322 Fund Trustee meeting for the check that Ford sent to Sweeney.

56. At some time point, Sweeney learned that in order to effect the transfer of pension credits for Keegan, the 420 Plan would need to receive at least the contributions paid to the Locals 121 and/or 322 Plans plus all investment income on those plans from the date they were received to the date of transfer in order to consider a transfer of pension benefit credit. Sweeney passed this message on to Ford who indicated that the investment income would take some time and Sweeney then assumed the additional payment would be forthcoming. The additional payment for interest or investment income from the Local 322 Fund never arrived.

57. On August 14, 1997, Joseph Wilkins, the new Local 322 Business Manager, asked Ford about this transfer and Ford responded to Wilkins the same day with a memo.

58. On August 19, 1997, Mark Belland, Local 322 Plan counsel, sent a letter to Sweeney advising that the payment was made erroneously. On August 20, 1997, Wilkins sent a letter to Sweeney advising that Keegan had no pension credits under the Local 322 Fund due to a break in service and non-vested status and also requested a return of the money.

59. On August 27, 1997, Sweeney sent Wilkins a check for the $16,063.44. The enclosed letter was copied to Keegan.

60. Prior to returning the check, Sweeney did not review the reciprocal agreement between the Local 322 and Local 420 Pension Funds nor did he discuss this agreement with anyone. He reviewed no documents other than the letters from Mr. Wilkins and Mr. Belland. Because Sweeney regarded reciprocal and payment errors of this magnitude as relatively common, he felt comfortable making a refund of this type, without separate consultation, and based solely on the representations of the Local 322 Fund.

61. The return of the payment was correspondingly indicated on Mr. Keegan's Local 420 Fund pension statement for the year ending December 31, 1997, which he received at some time in mid–1998. When Keegan inquired as to the reason for the return of the contributions, Rafferty informed him that the Local 322 Fund had failed to include interest with the initial payment of funds. He did not approach Sweeney to discuss the return.

62. On January 29, 1998, Richard Sigmond ("Sigmond"), Local 420 Plan counsel, provided copies of the Local 420 contribution reciprocal agreements to Doris Dabrowski, Keegan's counsel. The letter indicates that the Local 322 Fund had determined that it did not owe any reciprocal payments to the Local 420 Fund on behalf of Keegan because he was not entitled to benefits for the relevant period.

63. In a letter dated July 17, 1998, Sigmond informed Keegan's counsel that the 420 Plan could only pay participants if the benefits were supported by contributions. As the Local 322 Plan had not turned over those contributions, the Local 420 Plan could not provide plaintiff with the corresponding benefits.

64. The Local 420 Plan § 1.07, however, indicates that the Plan includes as credited hours, hours worked for which payment by an employer was due, but which remained outstanding or unpaid through no fault of the employee.

65. Absent the reciprocation of contributions from the Local 322 Fund, or the crediting of those contributions by the Local 420 Fund, plaintiffs will forfeit their credits earned for service in the jurisdiction of Local 322 during the term of their membership in Local 532.

## CONCLUSIONS OF LAW

### I. Federal Jurisdiction and Venue

Federal jurisdiction in this case is based on its subject matter, pursuant to 29 U.S.C. § 1132(e)(1), a provision of the Employee Retirement Income Security Act ("ERISA"). Venue is proper in the Eastern District of Pennsylvania as the office of the Local 420 is located in the district. Defendants have not objected to venue in this district at any time during this litigation.

### II. Effect of this Court's Prior Rulings

On the cross motions for summary judgment I determined that the contribution reciprocal agreements between the Local 121 Fund and the Local 420 Fund and the Local 322 Fund were ambiguous as to whether they required the parties to those agreements to make contributions on a retroactive basis. I also dismissed a number of the defendants from the action as I determined that plaintiffs had established no basis for their liability. This decision left two primary issues for trial: (1) determination of the meaning of the reciprocal agreements; and (2) whether Sweeney had breached any fiduciary duty when he returned the check for Keegan's contributions without conducting an independent investigation.

### III. Interpretation of the Reciprocal Agreement

The parties agree that the Local 420 Plan and Local 322 Plan are multiemployer employee pension benefit plans subject to the requirements of ERISA. The reciprocal agreements, as plan documents, are similarly governed by that statute. Though a case arises under ERISA, the court should apply general principles of contract interpretation to determine if a plaintiff may recover benefits due under the terms of a plan. *See Henglein v. Colt Indus. Operating Corp.,* 260 F.3d 201, 213 n. 8 (3d Cir.2001). If the language of a contract is clear and unambiguous on its face, then a court may not redefine its meaning through extrinsic evidence. *See Compass Technology, Inc., v. Tseng Laboratories, Inc.,* 71 F.3d 1125, 1131 (3d Cir. 1995). However, if the language of an agreement is not clear on its face, then the court may hold a trial in order to hear evidence and resolve the ambiguity. *See In Re: Unisys Corp.,* 58 F.3d 896, 901 (3d Cir.1995) (affirming the district court's decision to hold a trial concerning what they deemed to be ambiguous contract terms in determining if there had been a breach of fiduciary duty under ERISA). After considering the extrinsic evidence presented, in the form of stipulations, exhibits, trial testimony, and the parties' proposed findings of fact and conclusions of law, I find that the reciprocal agreements were not intended to apply retroactively. Therefore, plaintiffs are not entitled to reciprocal contributions for hours worked in the jurisdiction of Local 322 prior to February 1, 1984 and defendants did not breach their fiduciary obligations in failing to collect payments on behalf of plaintiffs under those agreements.

Relevant factors in interpreting an ambiguous contract include the general practice, custom, or usage in a particular industry. *See McQuestion v. N.J. Transit Rail Operations, Inc.,* 30 F.3d 388, 391 (3d Cir.1994). Courts may also consider the expectations of the beneficiaries of the

plan or contract and the intent of the contracting parties. *See Taylor v. Cont'l Group*, 933 F.2d 1227, 1233 (3d Cir.1991). In the instant case, industry custom weighs strongly in favor of finding that the reciprocal agreements do not apply retroactively. William Sweeney, the former administrator of the Local 420 Fund, who now works as the planner and administrator of Plumbers and Pipefitters National Fund, testified that in his experience he had never seen a reciprocal agreement applied to contributions for a time period prior to the date an individual became a participant in a fund. Joseph Wilkins, the business manager of the Local 322 Fund, offered similar testimony, indicating that he had never heard of the retroactive payments for contributions prior to membership.

The testimony of James McKeogh provides further support for the defendants' position. McKeogh, an actuary who has designed and regularly works with multiemployer benefit plans, offered testimony concerning the impact of retroactivity. First, like Sweeney and Wilkins, he noted that in his professional experience he had never seen a reciprocal agreement applied retroactively. McKeogh elaborated on this assertion by articulating both administrative and financial reasons why a retroactive application of a reciprocal agreement would have devastating effects on a pension fund. By allowing new members to receive retroactive pension credits, a plan administrator would be unable to effectively manage the funds because it would be impossible to truly know the liabilities of the fund over time. From a financial perspective, including retroactive payments would create a series of surprises for the actuaries involved on both ends of the transaction. The fund receiving these payments might face a sudden influx of contributions which had not previously been included in any planning and calcula-

tions. Even more harmful, the fund forced to suddenly withdraw contributions to make these retroactive payments might not be able to honor its outstanding debts and obligations. The uncertainty that retroactive payment creates indicates that it is unlikely the parties intended the agreements to apply in such a manner, undermining the financial soundness and administration of employee pension plans.

Plaintiffs have not offered a single example of a reciprocal agreement that applied retroactively nor offered evidence to rebut the defendants' assertion that no such agreements exist. Though plaintiffs look to the recital clause in the reciprocal agreement where the trustees expressed their desire to "keep the employees of each Pension Trust Fund eligible for benefits if possible," nothing in that statement implies the intention to apply the agreement on a retroactive basis. The language of the clause itself recognizes that the right to pension contributions is subject to certain limitations, as it indicates a desire to maintain eligibility *if possible*. Even as ERISA expanded the protections given to pension benefit plan participants, it did not create an absolute right to receive contributions for all work performed. Plaintiffs primarily base their position on public policy grounds, and fundamentally argue that they should retroactively receive contributions and pension credits based on those contributions because defendants' interpretation of the reciprocal agreements would result in forfeiture, a result disfavored by the law. Plaintiffs, however, never had a vested interest in a pension credit with the 322 Plan. The fund had a ten year vesting requirement and plaintiffs acknowledge that they did not complete ten years of service in the jurisdiction of Local 322. Though it is regrettable that plaintiffs forfeit the pension credits they earned as participants in the Local 322 Fund, that

regret does not justify interpreting the reciprocal agreement to permit the retroactive payment of contributions, giving plaintiffs a vested interest where they had none before. Moreover, it is not clear that the public interest lies in providing pension credits on a retroactive basis. Because retroactivity creates instability in established pension plans, the public policy is well served by solidifying these plans by not interpreting contracts to permit retroactive payment of credits.

Because I find that the reciprocal agreements between the Local 121 Fund and the Local 420 Fund and the Local 322 Fund and Local 420 Fund do not require contributions for the hours worked by an employee prior to participation in the Local 420 Fund, the fiduciaries of the pension funds had no obligation to obtain payment of those funds on behalf of the plaintiffs. Plaintiffs also acknowledge that they did not complete the ten years of service necessary to vest in the Local 322 Fund and have subsequently suffered a break-in-service resulting in the loss of those pension credits. Therefore, there is no basis on which the plaintiffs may recover either contributions or pension credits from the Local 322 Fund and the Local 420 Fund is not liable for its failure to collect those payments nor calculating the pensions of the plaintiffs to include the contributions earned under the Local 322 Fund prior to February 1, 1984.

## IV. Breach of Fiduciary Duty

■ The administrator of a pension plan or fund is a fiduciary. *See Pegram v. Herdrich*, 530 U.S. 211, 222, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Fiduciary status gives rise to the obligation to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters

would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (2000). Further, the fiduciary must act "solely in the interests of the participants and beneficiaries." *Id.* Where a fiduciary has breached his or her obligations, a participant may recover for benefits due under the plan, clarify future rights under the plan, or obtain other appropriate equitable relief. *See* 29 U.S.C. § 1132(a) (2000). A plan participant may obtain this equitable relief for breach of fiduciary duty even if he or she is not otherwise entitled to benefits under the terms of the plan. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1298 (3d Cir.1993).

■ Plaintiffs contend that independently of their entitlement to contributions under the reciprocal agreement, Sweeney breached his fiduciary duties by failing to review the reciprocal agreement or conduct further investigation prior to returning the check. Further they argue that Sweeney breached his responsibilities in failing to explain to Keegan why he was not entitled to benefits under the terms of the reciprocal agreements. Based on the evidence before the court, I find that plaintiff Keegan failed to meet his burden of showing by a preponderance of the evidence that Sweeney breached his fiduciary duties in either returning the check or failing to explain the reciprocal agreements to Keegan.

Though plaintiffs make much of the fact that Sweeney never specifically examined the reciprocal agreements, this does not constitute a breach of his duties as administrator. Keegan testified that at some point in 1995, he asked Sweeney about having his pension credits transferred from Local 322. He did not mention the reciprocal agreements. Sweeney followed up on this request and contacted people involved with both the Local 420 and 322

Pension Funds regarding the transfer of pension credits. Indeed, Sweeney accommodated Keegan's request, and on January 21, 1997, Sweeney received a check from the Local 322 Pension Fund for Keegan's pension contributions. On August 19, 1997, Sweeney received a letter from an attorney for the Local 322 Fund indicating that the fund had made the payment erroneously. That letter also did not mention the reciprocal agreements, but simply stated they had made the payment in error. The following day Sweeney received another letter, this time the Local 322 Benefit Fund Chairman. That letter specifically cited the vesting requirements of the 322 Fund and Keegan's break in service, and indicated that due to those factors, Keegan was not entitled to a pension credit. The letter makes no reference to the reciprocal agreements. On August 27, 1997, Sweeney complied with the requests to return the check. Sweeney, a credible witness, testified that there was nothing unusual about returning a check of that amount. The letters from the Local 322 Fund gave clear indication of why the transfer was erroneous, and as such errors are not uncommon, he simply returned the check as requested.

The return of the check that time was in line with the prevailing prudent man standard. Sweeney's actions were both reasonable and consistent with his responsibilities as a fiduciary. Though he did not inspect the reciprocal agreements, his duties did not obligate him to do so. Keegan's request was for pension credits, and Sweeney conducted an appropriate inquiry into obtaining those credits. Though Sweeney never discussed the meaning of the reciprocal agreements with Keegan, this does not constitute a breach of his fiduciary duties. A fiduciary does have a duty to provide accurate and relevant information to a beneficiary, *Bixler*, 12 F.3d at 1300, but Sweeney satisfied that obligation. He pursued Keegan's inquiry regarding pension credits. There was no indication either from Keegan or the Local 322 Fund that the reciprocal agreements were relevant to Keegan's entitlement to that credit, and therefore he had no duty to explain the meaning of those agreements. Sweeney provided Keegan with copies of the correspondence and Keegan never approached Sweeney to discuss the situation after the check was returned. At all times, Sweeney provided Keegan with relevant information that was, to the best of his knowledge, accurate. It was plaintiffs' counsel who first raised the issue of the reciprocal agreements when she requested copies of them in December 1997. Therefore, Sweeney's failure to discuss them with Keegan was not a breach of his fiduciary duties.

### ORDER

**AND NOW**, this day of July 2002, it is **ORDERED** that judgment is entered in favor of defendants and against plaintiffs on all claims.